(C. D. 794)

T. D. Downing Co. *v.* United States

United States Customs Court, Second Division

(Decided July 10, 1943)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Joseph E. Weil* and *Robert C. O'Grady*, special attorneys), for the defendant.

Before TILSON, Kincheloe, and LAWRENCE, Judges

KINCHELOE, Judge: This suit is for the recovery of certain customs duty claimed to have been wrongfully assessed by the collector at Boston, Mass., on an importation invoiced as 6,000 copies of "Coloured prints (printed wraps)" from A. Vivian Mansell & Co., Ltd., London, and imported by W. F. Schrafft & Sons Corp., Boston. According to the red-ink notation of the examiner on the invoice the merchandise was advisorily returned as "etchings, n. s. p. f.," and was accordingly assessed for duty by the collector at 25 per centum ad valorem under paragraph 1410 of the Tariff Act of 1930, which, so far as pertinent, reads as follows:

PAR. 1410. * * * blank books, slate books, drawings, engravings, photographs, etchings, maps, and charts, 25 per centum ad valorem; * * * .

The merchandise is claimed to be dutiable at 30 cents per pound as lithographic prints under paragraph 1406 of said act, which, so far as relevant, reads:

PAR. 1403. Pictures, * * * and other articles, composed wholly or in chief value of paper lithographically printed in whole or in part from stone, gelatin, metal, or other material (except boxes, views of American scenery or objects, and music, and illustrations when forming part of a periodical or newspaper, or of bound or unbound books, accompanying the same), not specially provided for, shall be subject to duty at the following rates: * * * all articles other than those hereinbefore specifically provided for in this paragraph, not exceeding twelve one-thousandths of one inch in thickness, 30 cents per pound; * * * .

An official sample of the involved merchandise is in evidence as exhibit 1, and consists of a colored picture of a dog's head on paper; and it has been stipulated herein that exhibit 1 is less than 12/1000 of an inch in thickness.

One witness was called by the plaintiff company. He was Percy E. Gillingham, who testified that he has been connected with the Forbes Lithographing Co., of Boston, for 25 years; that they are

engaged in the business of making lithographs and printing materials for advertising purposes, and that as art director of the company his duties consist of evolving ideas for carrying out such purpose; that he has held that position for the past 15 years; that he has personally observed the various processes employed in making lithographs; that the basis of lithography is the fact that oil or grease will not mix with water; that they now use a lot of photography in lithography; that lithography originally was worked from stone, but that since then they have "arrived at a different means of arriving at a printing plate," and that now they use a lot of photography, and that a lot of the old craft has gone out of it in that sense; that an article is lithographically printed by first preparing a sketch which is put before a camera, and color separations are made in the terms of the number of colors determined necessary to reproduce the job; that it is all in a continuous tone; that in order for one to find the means of reproduction they have to translate that continuous tone into terms of printable dot, and if one examines any print reproduced in that manner one will find a dot on there that gives the various tones.  He then examined exhibit 1 with a magnifying glass, and stated that it has a dot, and that in his opinion it is unquestionably lithographically printed because it has all the qualities one looks for in an offset lithographic reproduction, as indicated by the nature of the dot and the edges involved, which would show a metal plate, or the evidence of a metal plate on the edges, and that the dot which is just a little bit broken in places can be seen, which is clear evidence to him that it is lithographically printed.  (R. 3/6)

The same witness further stated that he has been studying and collecting etchings for 20 years, and that he does not think exhibit 1 could be considered an etching; that the term "etching" implies the use of a tool or an acid in relation to metal; that in order to make an etching a copper plate is prepared; the metal is heated, and a thin wax scum is put on the surface.  The artist then takes a tool and begins to draw on the wax.  After the drawing is finished, the plate is carefully varnished on the back and edges, and then immersed in an acid bath, when the acid then etches the copper where the lines have been marked on the wax.

Upon cross-examination the witness stated that there is a screening on the surface where the colors are in exhibit 1.

Asked, on cross-examination, as to how the colors were placed on the smooth paper surface, the witness answered:

A. To go back to explaining as I said before, this sketch is put up before a camera.  Through means of screens the colors are separated.  For instance, a yellow will be separated wherever it appears on there; another separation will show the red; another will show the black, or blue, or whatever is being used. That in turn is rephotographed through a half-tone screen, meaning that you get so many dots to the square inch.  For instance, we refer to a screen as a 133 line

screen, or 200 line screen, and that gives you a dot which is equivalent to 133 dots to the square inch, and you will find that the dot can fall on white paper, or over itself, depending upon the nature of the color reproduced.   It gives you completely that picture.

X Q.  Would that sample, exhibit 1, would that go through the color process of a machine as many times as there are colors?—A.  It would depend on the nature of the press.   We are equipped to handle four colors at one time.—This indicates it is a lithograph printing.

X Q.  Why do you say that?—A.  The way it is printed.   It is hard to describe in words, but to anybody who has been in the business I am in, it is almost second nature.   You can see it like a clothing man would know good wool.   (R. 8, 9)

The witness continued further that lithographic printing is not necessarily done on a smooth or glazed surface; and that he thinks exhibit 1 is made on a clay-coated stock; that he would not call exhibit 1 a smooth or glazed surface; that it is a semimat surface; that it has some preparation on it that gives it a smooth, absorbent finish, and that it is a paper treated with some process; and, further, that to him exhibit 1 is not an etching.   (R. 10)

Upon the transfer of the case to New York the Government called as one of its witnesses John R. Hecht, who testified that he is customs expert for the Import Committee of the paper industry; that he was an examiner in the appraiser's stores from 1899 to 1925; that as part of his duties he had to pass upon the classification of paintings, drawings, photographs, etchings, and lithographic prints for a good many years; that he made a particular study of the lithographic arts, lithographs, etchings, and engravings, and that in the course of his duties he had to distinguish between those processes thousands of times; that he was technical advisor to the Senate Finance Committee when the Tariff Acts of 1909 and 1913 were under consideration; and that he is familiar with lithographs.   Mr. Hecht further testified that as a result of his experience he is able to determine if an article is lithographically printed.

He described a lithographic print as follows:

A lithograph is printed from a flat plate, lithography being based upon the principle of revulsion of water and grease.   The image or picture is drawn on a limestone printing plate.   Limestone has a peculiar affinity for grease.   This drawing is done with a greasy crayon or ink.   Wherever the grease touches the stone it forms a chemical combination with the stone, which can only be removed by mechanical operations, grinding it off the face of the stone.   That portion of the picture which is drawn in ink on the stone will repel water and attract grease.   Before a printing is made from lithographic stone, the plate is moistened with a dampened roller, so that all portions of the plate not affected by the grease will repel the water.   Then the plate is inked, and the ink used has some grease in it, and the ink only adheres to that portion of the plate which was treated with the greasy ink.   Then a print is made on paper.   That stone is perfectly flat.   The impressions of lithographic print do not show any well-defined margins around the various portions of the picture.   In other words, the ink is pressed out evenly, so that dots made from a lithographic plate will not have a well-defined margin.   (R. 15).

The witness stated further that he had the same experience with etchings, and that an etching as ordinarily understood is an intaglio process, as follows:

\* \* \*. A copper plate is covered with wax. The artist draws the picture on the wax, thereby taking some of the wax from the plate. When the picture is drawn, it is immersed in acid, and wherever the wax was removed the acid eats in. When it is sufficiently etched, or bitten, as they call it, the dots are removed and the plate is ready for printing. In printing an etching the plate is inked, and then wiped, so that the ink only remains in the crevices. When the plate is printed the paper sucks the ink out of the crevices. There is another process known as the half-tone process, where the plates are prepared through so-called color separation, and are etched photochemically. That produces a plate with a raised surface. That plate is inked, but the ink is printed from the raised portions of the plate. That is called the cameo process.

Judge KINCHELOE. What is the difference between etching and lithographing, from a visual inspection?

The WITNESS. Under the glass an impression from an etched plate will show a heavy deposit of ink on the paper. In the case of lithograph, it is perfectly flat, and the grain of the stone produces a certain character in the impression which can be distinguished. (R. 15, 16)

Counsel for the defendant then read to the witness the testimony of plaintiff's witness Gillingham as to how an article is lithographically printed, as follows:

First of all a sketch is prepared, after which it is put before a camera, and color separations are made in the terms of the number of colors determined necessary to reproduce that job. All that is in continuous tone. In order for us to find a means of reproduction, we have to translate that continuous tone into terms of printable dot, and if you examine that print (exhibit 1) and any print reproduced in that manner, you will find a dot on there that gives the various tones. (R. 5)

Mr. Hecht stated that he agreed with the said statements of Mr. Gillingham. He then examined exhibit 1 with a magnifying glass and stated that in his opinion exhibit 1 is not lithographically printed. (R. 17) When asked on what he based that opinion, the witness stated:

A. By the appearance of the ink on the paper. There is a piling up of ink on the edge of the paper, edge of the print. The dots in the print show a similar piling up of color around the rim. In other words, that rim is darker than the interior of the dot, which is caused by the ink being pressed out or forced out to the margins of the particular raised portion of the plate. It can be illustrated by inking the end of a lead pencil, inking with a pad, and then pressing it upon paper, it was shown that the ink was forced out to the edges. When you press down the ink is forced out, and piles up on the outside rim of the dot.

Q. Is that referred to as a margin or a fence?

A. That is known in the industry as a fence. I have illustrated dots made there by a pencil, and also drawn what appears to be a dot made by a raised plate, and also an illustration of a dot produced by lithography. (R. 17, 18)

The illustrations referred to were thereupon offered and received in evidence as illustrative exhibit 2.

Q. Do you know what kind of paper exhibit 1 is on?

A. Clay-coated paper.

Q. Is that the paper that is usually used for lithography?—A. Yes, when printing directly from a stone, but when printing by the lithographic offset process, a non-coated paper is employed. The lithographic offset process is the taking of the ink from the lithographic plate by means of a rubber roller, and then printing it from that roller on the paper. By that means you can get a very good impression on rough paper where you couldn't get a good impression direct from the stone on rough paper. (R. 18, 19)

The witness then testified further that from his experience, and based upon his examination, exhibit 1 is not an offset lithographic reproduction; that exhibit 1 has not been printed by any lithographic process, but was printed by what is known as a four-color process, in which metal plates are made for each color, and the metal plates are etched by the photochemical process. The picture to be produced is set before a camera and an exposure made from the negative, of which a plate is produced by this photochemical etching, and that plate is printed in black. Another exposure is taken by the camera in which a ray filter is used. The first would be a ray filter which excludes everything but the yellow rays, so that the resulting plate made from that negative is printed in yellow. The next exposure is taken with a ray filter which excludes everything but the blue rays, and a negative is made and printed in blue. Another exposure is made by means of a ray filter which excludes everything but the red rays, and a corresponding plate made printed in red. These impressions are made one upon another. (R. 19, 20.)

The witness further testified that the printing is made directly from the metal plates on exhibit 1; that exhibit 1 is not ordinarily known or commercially known as an etching, but that it is known as a four-color print printed from metal plates etched by the photochemical process. Also that he is familiar with T. D. 44400, in which he testified, and that the merchandise in that case was similar to the merchandise in the present instance; also that the merchandise in both cases was produced in the same way. (R. 21) That exhibit 1 is not commonly known as an etching, and that while he never actually produced lithographs, he has seen them made.

James C. Quin was the Government's second witness. He testified that he is examiner of merchandise at the port of New York; that he has advisorily been classifying lithographs and various articles of paper for the past 4 years; that he has to determine whether an article has been lithographically printed, by a visual examination; that he has heard Mr. Hecht testify about the fence and the margin (R. 22); and that he employs that as a test in determining whether an article is a lithograph or not. After an examination of exhibit 1 he stated

that it was not lithographically printed, although he admitted that he had no commercial experience in the production of lithography.

The Government's last witness was Frank A. McCarthy, examiner of merchandise at New York for the past 23 years. He stated that his line consists of photographs, etchings, engravings, and paintings; that during said time he had to examine a great many articles to determine definite types of prints and etchings; that he can tell by an examination whether an article is a lithograph or not; that he was in court when Mr. Hecht testified, and that he employs the same test as Mr. Hecht. After an examination of exhibit 1 he stated that in his opinion the print had been produced by what is known as the photochemical process and is commercially and commonly known and sold as a four-color print. Also that it is not a lithograph nor an etching. (R. 24) He further testified that he is familiar with the case of *United States* v. *Rudolph Lesch*, 18 C. C. P. A. 211, T. D. 44400, which affirmed the decision of this court published as T. D. 43749 (56 Treas. Dec. 667); that there was similar merchandise before the court in that case produced in the same way; that he has been advisorily classifying merchandise from A. Vivian Mansell & Co. (the exporting firm herein), for the past 23 years, and that he has advisorily classified merchandise of that firm similar to exhibit 1, under paragraph 1410 (act 1930) at 25 per centum, following said decision. The witness stated further that while he never made a lithograph, he has seen many of them made, and has spent many hours watching them being made.

In T. D. 43749, *supra*, certain photographic reproductions of paintings, in color, were assessed with duty at 5 cents a pound and 20 per centum ad valorem under paragraph 1305 of the Tariff Act of 1922, as printed matter on surface-coated paper, and were claimed to be free of duty under paragraph 1530 of that act, providing, among other things, for engravings, photographs, etchings, lithographic prints, etc., imported by any society or institution incorporated or established solely for religious, philosophical, educational, scientific, or literary purposes, or for the encouragement of the fine arts, etc. According to the testimony in that case, including that of Mr. Hecht, the process of manufacture of the pictures therein was shown to be the same as in the present case, and it was also shown that the pictures were known as four-color prints, produced by the photochemical process described under the caption "Color photography" in the New International Encyclopedia, 1926, Vol. V, page 623. This court therefore held the pictures to be photographs under said paragraph 1530, "particularly since the word is there used without limitation."

In affirming our finding in said T. D. 43749, the appellate court used the following language:

After a careful study of the testimony and the several written articles on the subject of color photography, we conclude that the importation at bar is known as a 4-color print and was produced by the photochemical process; that is, the plates were made by the colored photography process which embraced both an etching and a photographic process and that the prints were made from the plates so produced.

As we understand it, ordinary photographs are printed from negatives or plates which are made by light exposures upon sensitized plates, the action of the light on the sensitized plates bringing about some kind of chemical action, and ordinarily a photograph is not the result of any etching process. In *McLaughlin & Freeman* v. *United States*, 18 C. C. P. A. (Customs) 128, T. D. 44094, where paragraph 1310 was under consideration, we defined a "photograph" as meaning "a picture or likeness obtained by photography."

It seems obvious that the word "etching" as used in paragraph 1530, having no limitations, is used in a broader sense than the word "etching" as used in paragraph 1704, where all etchings made by photochemical or other mechanical processes are excluded. The instant importation is made by photographic and etching processes. The fact that the color photograph at bar was made in part by etching, under these circumstances, should not exclude it from the paragraph.

We are impressed with the weight given by the court below to the language used in paragraph 1704 where Congress limited the words "etchings" and "engravings" to those only which are "etched or engraved with hand tools and not such as are printed from plates or blocks etched or engraved by photochemical or other mechanical processes." It seems to us, as it evidently seemed to the court below, that if Congress had wished to exclude the product of color photography from the word "photograph" in the paragraph under consideration, it would have employed language similar to that used in paragraph 1704. * * *.

In the present instance paragraph 1410 of the act of 1930, under which the imported prints were assessed, provides, among other things, for "engravings, photographs, etchings," etc., without qualification, and would presumably include said articles in their broadest sense. Inasmuch as it is agreed by the witnesses on both sides that the prints in question are not "etchings," this would deprive the collector's classification of the usual presumption of correctness. But if it appears that the so-called color prints are photographs, they would still be dutiable under said paragraph 1410, as photographs, at the same rate as assessed. And at any rate the burden is on the plaintiff to prove his claim even though the collector's classification of the merchandise as "etchings" may not have been correct.

As we read the record as presented the question now before us is whether the so-called color prints are still dutiable under paragraph 1410 of said act of 1930, as photographs, or under paragraph 1406, as lithographic prints, as claimed.

As to the method of producing lithographs, plaintiff's witness Gillingham and defendant's witness Hecht seem to be in substantial

agreement. They simply differ as to the telltale marks, or lack of them, on exhibit 1 which ordinarily determine whether an article is lithographically printed.

In this connection plaintiff's witness Gillingham made an examination of exhibit 1 under the microscope and stated that in his opinion it is unquestionably lithographically printed; that it has all the qualities that they look for in an offset lithographic reproduction. He admitted there were other means of arriving at the same result, but that he did not see any evidence of what might naturally be seen if it was done by any other method, and stated that the indications of the lithographic printing thereon are "the nature of the dot; the edges involved, which would show a plate, a metal plate, or the evidence of of a metal plate on the edges, and the nature of the dot. If anybody cares to look through that, you can see the dot is just a little bit broken in places, and that it is clear enough evidence to me that it is lithographically printed."

The Government witness Hecht also examined exhibit 1 under a microscope, and his conclusion that the article was not lithographically printed was based on the fact that there was a piling up of the ink on the paper, which is known as a margin or fence, and he made certain illustrations on a piece of paper (illustrative exhibit 2) showing what the dots look like when made by a raised plate and when by a lithograph; that exhibit 1 is clay-coated paper, and that while such paper was usually used for lithographs when printing directly from stone, when printed by the lithographic offset process a non-coated paper is used. That exhibit 1 is not an offset lithograph, and that it is not printed by any lithographic process, but by what is known as a four-color process directly from the metal plates, and that it is a four-color print produced in the same manner as testified to by him in said T. D. 44400.

The only one physical indication referred to by Mr. Gillingham as proving that exhibit 1 was a lithograph was that the dot was "just a little bit broken in places." We hardly think this testimony is sufficient to establish that the article is lithographically printed, in view of the more detailed explanation and illustrations of Mr. Hecht tending to show that the imported articles are not lithographic prints, but are so-called color prints produced in the same manner as described in said T. D. 44400, and whose testimony has been corroborated by examiner McCarthy, who stated that for 23 years he has advisorily classified merchandise from the same exporter as in the present case, as photographic prints.

However, as it has not been definitely established herein that the imported articles have been lithographically printed, but that they are four-color prints produced in the same way as described in said

T. D. 44400, wherein they were held dutiable as photographs, the claim of the plaintiff under paragraph 1406 of the act of 1930 is overruled without, however, affirming the collector's classification of the merchandise as "etchings" under said paragraph 1410.

Judgment will be rendered accordingly.